**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **CHICAGO TRIBUNE COMPANY, an Illinois corporation,** )<br>)<br>) | |
| Plaintiff, )<br>) | |
| v. ) | No. 07 C 0865 |
| )<br>**FOX NEWS NETWORK, LLC, a Delaware** )<br>**limited liability company, d/b/a FOX** )<br>**NEWS CHANNEL,** )<br>) | |
| Defendant. )<br>) | |

**MEMORANDUM OPINION AND ORDER**

In 2002, plaintiff Chicago Tribune Company ("Tribune") began publishing a free, tabloid-style daily newspaper called the REDEYE. Tribune has two United States federal trademark registrations for the REDEYE mark for "newspapers for general circulation." One is a word mark for REDEYE and the other is for a design consisting of the mark REDEYE appearing inside the letter "I". In early 2007, Fox News Network, LLC d/b/a/ Fox News Channel ("Fox News") introduced a late-night (1:00 a.m. in the Chicago area) show called "Redeye with Greg Gutfeld."[1] Tribune promptly brought this trademark suit under section 32 and 43(a) of the Lanham Act, 15 U.S.C. secs. 1114 and 1125 (a) (2006). The Tribune trademarks do not extend to television, although the day after Fox's late night show began, Tribune filed applications for new redeye marks for

---

[1] In order to distinguish the two, I will refer to plaintiff's mark as "REDEYE" and defendant's program as "Red Eye."

both television and the internet. Tribune seeks a preliminary injunction requiring Fox to change the name of its show. The motion for a preliminary injunction is denied but the case will be set for an expedited trial.

I.

To obtain its desired preliminary injunction, Tribune must show that it (1) is likely to succeed on the merits; (2) has no adequate remedy at law; (3) will suffer irreparable harm which, absent injunctive relief, outweighs the irreparable harm Fox News will suffer if the injunction is granted; and (4) the injunction will not harm the public interest. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 811 (7th Cir. 2002) (citations omitted). Tribune has the burden of proof to make a clear showing that it is entitled to the relief it seeks. *See Goodman v. Illinois Dep't of Fin. and Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (citations omitted).

To prevail in an action for trademark infringement, a plaintiff must establish: "(1) that it has a protectible trademark, and (2) a likelihood of confusion as to the origin of the defendant's product." *Ty, Inc., v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001) (quoting *Int'l Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir. 1988)).

II.

Defendant first challenges the protectability of plaintiff's registered marks. The five categories of trademarks, in descending order of distinctiveness, are: fanciful, arbitrary, suggestive, descriptive, and generic. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9-11 (2d Cir. 1976) (Friendly, J.). The degree of protection available to a mark depends on its classification: a mark that is fanciful, arbitrary or suggestive is protected; a descriptive mark is protected only if it has acquired secondary meaning; and a generic mark is not protected. *Id.* Arbitrary and suggestive marks are automatically entitled to trademark protection because they are inherently distinctive. *Two Pesos*, 505 U.S. at 767-68; *Platinum Home Mortgage Corp. v. Platinum Fin. Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998). A mark is classified as arbitrary when it neither suggests nor describes any ingredient, quality, or characteristic of the good or service with which it is associated. *See Custom Vehicles, Inc. v. Forest River, Inc.*, 476 F.3d 481, 486 (7th Cir. 1997) ("Apple Computer" is an arbitrary mark "because a computer has nothing to do with an apple"); *Sullivan v. CBS Corp.*, 385 F.3d 772, 776 (7th Cir. 2004) ("The word 'survivor' when used as a band name is arbitrary; there is nothing about the word which is necessary to the description of a band."). A suggestive mark is one "which requires some operation of the

imagination to connect it with the goods." *G. Heileman Brewing Co. Inc., v. Anheuser-Busch, Inc.*, 873 F.2d 985, 998 (7th Cir. 1989) (quoting *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 379 (7th Cir. 1976)); *see also Sands, Taylor & Wood Co. v. Quaker Oats, Co.*, 978 F.2d 947, 953 (7th Cir. 1992) ("mental process [is] required to connect a name that is incongruous or figurative with the product.").

In contrast to arbitrary and suggestive marks, "[d]escriptive [marks] are usually not entitled to protection 'because they are a poor means of distinguishing one source of services from another and because they are often necessary to the description of all goods or services of a similar nature.'" *Sullivan*, 385 F.3d at 776 (quoting *Liquid Controls Corp. v. Liquid Control Corp.*, 802 F.2d 934, 936 (7th Cir. 1986)); *Blau Plumbing, Inc., v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 609 (7th Cir. 1986) ("To allow a firm to use as a trademark a . . . descriptive word still understood by the consuming public to describe, would make it difficult for competitors to market their own brands of the same product."). "A descriptive mark is not a complete description [of the good], but it picks out a product characteristic that figures prominently in the consumer's decision whether to buy the product or service in question." *Custom Vehicles,* 476 F.3d at 483. These marks may receive trademark protection, however, if they acquire secondary meaning. *Gimix, Inc. v. JS & A Group, Inc.*, 699 F.2d 901, 907 (7th

Cir. 1983). "Secondary meaning refers to the manner in which a consumer identifies a specific business or a business's reputation by a particular trademark." *Platinum Home Mortgage*, 149 F.3d at 728 (citation omitted).

Under the Lanham Act, "a mark registered on the principal register . . . shall be prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1115(a). Accordingly, registered marks are presumed not to be descriptive or generic; or, if descriptive, then the mark is presumed to have secondary meaning. *Liquid Controls*, 802 F.2d at 936. These presumptions can be overcome with evidence that the mark is descriptive or generic, or that it lacks secondary meaning. *See Door Sys., Inc. v. Pro-Line Door Sys., Inc.*, 83 F.3d 169, 172 (7th Cir. 1996).[2] Classification of a trademark is a factual question. *See, e.g., Sands,* 978 F.2d at 953; *RWT Corp. v. Wonderware Corp.*, 931 F. Supp. 583, 586 (N.D. Ill. 1996).

Defendant argues plaintiff's mark is descriptive. In doing so, it relies primarily on plaintiff's representation to the United States Patent and Trademark Office ("USPTO") in response to the USPTO initial rejection of plaintiff's applications because of a prior registration of the mark REDEYE in connection with "newspaper cartoons." Plaintiff responded that there was no likelihood of

---

[2]The parties do not dispute the mark has not become uncontestable.

confusion between the two marks because:

> "RED EYE," according to the 2003 Cambridge Dictionary of Idioms, means "a flight that leaves late at night and arrives early in the next morning" and "cheap whisky strong alcoholic drink." . . . Hyperdictionary.com defines it as a verb, rather than a noun: "(v) travel on an overnight flight; 'The candidate red-eyed from California to the East Coast the night before the election to give a last stump speech.'" . . . Used for a general circulation newspaper, "RED EYE" suggests current, up-all-night, highly-caffeinated news reporting and that is the connotation with which applicant uses the mark."

(Def. Op. Brief. Exh. F.) According to defendant, "the adjectives 'current, up-all-night, highly-caffeinated news reporting' are descriptive of the service provided by the REDEYE and demonstrate that the mark is [] descriptive." (Def. Resp. to Supp. Mem. at 14.) Defendant also argues plaintiff's representation to the USPTO estops it from arguing the mark is arbitrary. Plaintiff argues the mark is not descriptive, but arbitrary or suggestive and therefore entitled to protection.

I agree that the mark is not descriptive. Redeye is not "a product characteristic that figures prominently in the consumer's decision whether to buy the product or service in question." *Custom Vehicles*, 476 F.3d at 483. The late-night nature of any news reporting is not a prominent or defining characteristic of this publication. The mark, therefore, is not descriptive. Whether plaintiff's mark is most properly classified as suggestive or arbitrary is a closer question, but it appears to have been intended to be suggestive of wakefulness during the late evening or

very early morning hours.  At the least, "some operation of the imagination" is necessary to connect the word redeye with the newspaper.  For purposes of this decision it makes no difference whether the mark is denoted arbitrary or suggestive.  Plaintiff's mark is entitled to trademark protection.

## III.

Plaintiff must next establish a likelihood of confusion.  "In assessing the likelihood of confusion, courts have identified seven relevant factors that help in deciding the ultimate question: (1) the similarity of the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be used by consumers; (5) the strength of the plaintiff's mark; (6) whether any actual confusion exists; and (7) the defendant's intent to palm off its goods as those of the plaintiff."  *Sullivan*, 385 F.3d at 776 (citations omitted).

### A.  Similarity of the Marks

The comparison among marks must be made "in light of what happens in the marketplace and not merely by looking at the two marks side-by-side."  *Id.* at 777 (quoting *Ty,* 237 F.3d at 898).  The Seventh Circuit warns "[i]t is 'inappropriate to focus on minor stylistic differences to determine if confusion is likely' if the public does not usually encounter the two marks together."  *Id.* (quoting *Meridian Mut. Ins. Co. v. Meridian Ins. Group, Inc.*, 128 F.3d 1111, 1115 (7th Cir. 1997)).  The Seventh Circuit also

instructs that "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *Id.* (quoting *Henri's Food Prods. Co., v. Kraft Inc.*, 717 F.2d 352, 356 (7th Cir. 1983)); *Ty*, 237 F.3d at 898; *Meridian*, 128 F.3d at 1115.

The word "redeye" is the salient portion of the mark and the title of the television program. The Chicago Tribune name does appear on the cover of the REDEYE, but in significantly smaller font. In turn, although the program's official title is "Fox News' Red Eye w/Greg Gutfeld," the Executive Vice President of News Editorial for Fox News, John Moody, testified that he believed the term "Red Eye" in the title of the program was likely to resonate with viewers because it somehow captures the essence of the program (Moody 3/18/07 Tr. at 433) ("We want a word in there that evokes what the show is"); the host and guests of the program refer to it on air as just "Red Eye". Shelly Stevenson, senior producer at Fox News, also testified that Red Eye is the part of the title most likely to resonate with viewers (Stevenson Tr. at 451-52) ("we wanted to come up with something that tipped its hat to the people we are serving"). Both Tribune's and Fox News' logos emphasize the word redeye in larger fonts and by its location on the logo. As the salient portion of the mark, the word redeye is given greater weight than the surrounding elements. *See* 3 McCarthy, *Trademarks and Unfair Competition* § 23:42 ("It is appropriate . . . to give

8

greater weight to the important or 'dominant' parts of a composite mark, for it is that which may make the greatest impression on the ordinary buyer.").

Aurally, the salient portions of the mark and television program title – REDEYE and Red Eye – are indistinguishable. *See Barbecue Marx*, *Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000) (examining "aural similarit[ies]" among the marks); *Meridian*, 128 F.3d at 1116. The television program is referred to as just "Red Eye" on air by its host and guests. The General Manager of REDEYE, Bradley Moore, testified he had never heard anyone refer to the newspaper as "the Chicago Tribune REDEYE." (Moore Tr. at 66:6-8.) Accordingly, I find plaintiff has established a likelihood that the salient portion of both the mark and the television program title are aurally identical. *See id.* at 1116 ("Any visual distinctions between the parties' use of the [mark] are irrelevant in the aural realm."); *Personeta, Inc. v. Persona Software, Inc*., 418 F. Supp. 2d 1013, 1016 (N.D. Ill. 2005) (Gottschall, J.) (evaluating aural similarities among salient features of names).

The marks do not resemble each other visually. The newspapers' logo depicts the letter "i" in red over a black background, with the word REDEYE in the stem of the "i" in the color white. The word is written in three lines; on the first line is only a large letter "R," on the second line and in slightly

smaller font are the letters "E" and "D", and on the third line, also in slightly smaller font is the word "EYE." This design resembles an eye chart. Throughout the publication, the newspaper refers to itself as REDEYE. (Pl. Exh. 47.) In turn, the television program's logo consist of the words "Red" and "Eye" on two separate lines. The word "RED" is in the color red and is in a cursive type font over a circular design. The word "EYE" is in lower caps and in gray in what defendant describes as "futuristic font." The words "w/ Greg Gutfeld" appear in two lines and smaller font below the word "EYE." The words "Fox News" are also on the page, and is spelled vertically underneath the capital letter "R" of the word "RED." The words are over a background that contains red, black, white and gray shades of color. The "bug" or graphic in the lower right hand corner of the screen states "Red eye" and the standard "Fox News Channel" bug rotates on the left hand side of the screen. Although there are some similarities among the logos (both are primarily colored red, black and white; defendant's logo also has some gray), and there is a circular graphic design featured in both logos, which defendant states in its brief is a "graphic design of an 'eye'" (Def. Op. Br. at 19 n. 4), the logos are visually distinct.

Overall, despite the differences in their visual characteristics, I find the aural likeness among the titles tips this factor in favor of plaintiff.

## B.  Similarity of the Product

"In assessing whether products are similar, the question is 'whether the products are the kind the public attributes to a single source.'"  *Ty*, 237 F.3d at 899 (quotation omitted).  "[A] closely related product is one which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner."  *Id*. at 900 (citations omitted).  A likelihood of confusion may exist even if the parties are not in direct competition or their products and services are not identical.  *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 679 (7th Cir. 2001) (citations omitted); *Int'l Kennel Club*, 846 F.2d at 1089.  "Modern trademark law prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior user but also on products that are considered to be 'closely related' to the senior user's."  *Sands*, 978 F.2d at 958 (citing *Int'l Kennel*, 846 F.2d at 1089).  "A 'closely related' product is one 'which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner."  *Id*. (quoting McCarthy, *Trademarks and Unfair Competition* § 24:3, at 166).

There is little overlap in the content of the parties' products.  REDEYE contains some international, national and local news taken from the Chicago Tribune and other sources, a heavy

11

emphasis on entertainment, and a large number of ads for local products and entertainment. The television program is a talk show with a host, Gutfeld, who dominates the program, and several other participants, some of whom are on the show every night and sit with the host, and others who are taped from different locations. The show's program refers to particular items in the news. The items discussed appear to include anything that strikes Gutfeld's interest, and sometimes involve a serious news story of the day, and thus could include a topic also discussed in REDEYE (both discussed a recently deceased woman, Anna Nicole Smith, who was in the news at the time), although more often is the aberrational odd story, at least so far, if the items in evidence and on the show's internet site are representative.[3] Discussions on the television program rarely appear to last longer than a minute. The format is intended to be outrageous and funny.

---

[3] The headlines on the "Fox News Red Eye with Greg Gutfeld" webpage on 3/25/07 under "Insomniac Central" are "Oh Dear! Wisconsin man gets probation for having sexual contact with dead deer;" "Medical Mystery. Woman finds nipple on bottom of her foot!" "Forget About It! Scientists are developing drugs to erase traumatic memories;" "Booze Culture? British health chief fears 'epidemic' of STDs sparked by booze-fueled teens;" "About Last Night ... Israel recalls ambassador found naked, drunk and bound;" "Ride 'Em Cowboy. Meet Whiplash, the dog-riding cowboy monkey;" "Road Rage. Woman remains in jail after shooting tailgater's tires!" "Nude Protest. College students in California bare all to save threatened trees;" "Balloon Busters. New sex videos show women popping balloons;" "Cold Front? Weather Channel anchor gets hiccups on air!" Clicking on any of these headlines leads to video clips from the television show. Animals and sexual topics dominate the discussions.

"The fact that the products at issue may be 'very different' is not dispositive of the issue of the similarity of the products in determining the existence of a likelihood of confusion between the products. The question is 'whether the products are the kind the public attributes to a single source.'" *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1169 (7th Cir. 1986) (quotation omitted) (district court should have considered the question of whether the purchasing public might believe that a single source produced both McGraw-Edison's electronic fuses and Disney's video games). The sources of the respective products are the Tribune and Fox News. Both are national media and news companies. Any viewer of the Fox Red Eye program would know that the show is on the Fox channel because the Fox News logo is displayed continuously on the screen during the show's broadcast. Similarly, the REDEYE newspaper states on its cover that it is published by the Chicago Tribune. The issue therefore is whether the public distinguishes these two entities sufficiently that a viewer would know instantly or within a short time, that a Fox program is put on by an entity distinct from the Tribune. It is the Tribune's burden to show that the consumer of these two well known companies would not know the difference.[4] Tribune put on no evidence on this issue.

---

[4] A related issue is whether a consumer would believe the two companies had decided to join forces in producing the show or the newspaper.

I conclude that the only similarities between the products are the fact that both involve a media used to deliver news. On this record, the dissimilarities between the products means this factor favors defendant.

## C. Area and Manner of Concurrent Use

When considering the area and manner of concurrent use, I must assess whether "there is a relationship in use, promotion, distribution, or sales between the goods or services of the parties." *Forum Corp. of N. Am. v. Forum, Ltd.*, 903 F.2d 434, 442 (7th Cir. 1990). In evaluating this factor, I consider: (1) the relative geographical distribution areas; (2) whether evidence exists of direct competition among products; (3) whether the product is sold through the same marketing channels. *Ty*, 237 F.3d at 900.

Defendant stresses that its program is aired on international cable television, and is not in print, and argues therefore there is no evidence of similarity of marketing channels. It is undisputed that both of the parties' products are available in the greater Chicago metropolitan area and that both parties use the internet and television to promote or provide their product. (Pl. Exh. 40, 43.)

If the targeted audience is limited to age there is overlap in their targeted consumers since both parties claim to target a

younger audience. REDEYE's primary stated target demographic is urban young professionals "who are short on time but want to be informed on current issues." (Complaint, ¶ II.) There was testimony that the average income of a REDEYE reader is $77,000. From 54 to 70 percent of REDEYE readers have a college education. The age range of the target audience is 18-34. The newspaper is distributed in boxes near Chicago subway and bus stations and on college campuses.

The television program's producer, John Moody, gave varying descriptions of his target audience, from "slackers and losers" to the "depressed, the dissatisfied, the depraved" to "bloggers." (Moody 2/26/07 Tr. at 153, 165; Moody 3/8/07 Tr. at 440.) He also testified that the target audience was younger viewers, from 18-40 years of age. The show's host, panelists and others who provide commentary (with the exception of the host's mother, who apparently is a regular feature) are all within that age group. Whether the target audience consists of losers or not, the show appears to be aimed at a younger audience, but one that is awake and watching television at 1 a.m. or later (the show is on at 2 a.m. on the East Coast). While the show is available to a large number in the Chicago area, testimony indicated that maybe 7,000 Chicago households were tuning into the program in early March, 2007.

Apart from an overlap in age, on this record there is no evidence that REDEYE is in direct competition with Fox's Red Eye

television program.   This factor therefore slightly favors
defendant.

### D.   Degree of Care

In closing argument on this motion, Tribune acknowledged that
there was no evidence on the degree of care likely to be exercised
by the relevant consumers but argued that "logically" consumers of
a free newspaper and a show airing at 1:00 a.m. exercise little
care as to the source of the product.   The converse argument is
that however nondiscriminating these consumers may be, most people
probably know what television channel they are watching and know
the difference between Fox and Tribune, both very well known, and
each clearly identified on its respective product.   That may not be
the case but I agree that there is no evidence in the record on
this issue and I do not think there is a basis for drawing the
conclusion that Tribune asks.

### E.   Strength of Mark

A mark's classification in one of the five categories of
trademarks is only partially indicative of the mark's strength.
*See Sullivan*, 385 F.3d at 777.   I must also consider the mark's
marketplace recognition value.   *Id*. ("The crucial question is
whether the mark is strong enough that the public will form an
association between the mark and the source of that particular
good.") (citing McCarthy, *Trademarks and Unfair Competition* §
11:73); *CAE*, 267 F.3d at 684 ("propensity to identify the products

or services sold as emanating from a particular source"); *see also* McCarthy, *Trademarks and Unfair Competition* § 11:83 ("While some courts have the strong-weak evaluation solely upon the place of a term on the spectrum of marks, such an approach is incomplete. One must in addition look at the marketplace strength of the mark at the time of litigation."). Factors such as the extent of advertising, public recognition, sales and length of use are considered. *See CAE,* 267 F.3d at 685. Another consideration is the extent to which third parties use similar marks. *Id*. at 685; *McGraw-Edison*, 787 F.2d at 1171.

I have already classified Tribune's mark as at least suggestive, which the law recognizes as inherently distinctive. *Two Pesos, Inc.*, 505 U.S. at 767-68. Plaintiff has also submitted evidence that it has spent approximately $4 million in advertising campaigns promoting the newspaper since 2002. (Moore Tr. at 40; Pl. Exh. 10.) The circulation of the newspaper is approximately 140,000 a day, and there was testimony that it has a "pass along readership" of 2:1, which translates into a daily readership of approximately 280,000 (Moore Tr. at 46-47; Pl. Exh. 13.) The mark has been in continuous use since 2002. (Moore Tr. at 32, 35-36.) Plaintiff also submitted evidence of the recognition of the mark. (See Pl. Exh. 9; 24; 25; *see also* Jurczak Tr. at 297.) Finally, plaintiff offered the testimony of a marketing expert who testified that REDEYE has become a well recognized brand in the Chicago area.

Defendant argues that third parties use the mark extensively, which is indicative of the mark's weakness. In support it submits a result list of a search on a Lexis-Nexis database. (Def. Exh. 55.) This document contains five columns which list the name of the business, its street address, city, state, and some kind of description of the business. The document itself does not identify its source or any headings for the columns, nor does it explain the abbreviations in the description column. Mitch Kweit testified he ran the search on Dun's Market Identifiers, a database available on Lexis Nexis. (Kweit Tr. at 462-63.) After excluding duplicate results, this list reveals approximately 350 businesses use the word redeye. (Kweit Tr. at 465.)

Defendant's list is not evidence that these third parties' marks are actually used, well-promoted, or recognized by consumers, thereby weakening plaintiff's mark. *See CAE*, 267 F.3d at 685 ("[defendant] did not introduce any evidence of actual use of the [] mark by third parties nor did it introduce evidence the third parties' marks were well-promoted or that they were recognized by consumers."); *McGraw-Edison*, 787 F.2d at 1171 ("'A trademark which is found only in the records of the [PTO] does not materially affect the distinctiveness of another's mark which is actively used in trade.'") (quoting Callmann, *Unfair Competition, Trademarks and Monopolies* § 20.44, 270 (4th ed. 1983)). In fact, Kweit testified the list is not indicative of how the listed businesses market

themselves, or even if they are still in operation. (Kweit Tr. at 470.) Second, the list itself reveals only two businesses (out of approximately 350) that are described as arguably being in the same business as plaintiff. Neither of these businesses operate in Illinois. One of the two describes itself as "news syndicates" and another as in "book publishing." (Pl. Exh. 55; Kweit Tr. at 471.) Neither of these descriptions are defined, however, and there is no evidence on record that those two entries have anything to do with a newspaper or a television program.

The evidence in the record supports plaintiff's claim that REDEYE is a strong trademark in the Chicago area. The strength of the mark favors plaintiff.

## F. Actual Confusion

Although evidence of actual confusion is not required for a preliminary injunction, "if available, [it] is entitled to substantial weight." *Meridian*, 128 F.3d at 1118 (citations omitted); *see also Ty*, 237 F.3d at 900-01 (upholding issuance of preliminary injunction even though lower court did not find evidence of actual confusion). Plaintiff presented one witness, Brian Jurczak, who testified to momentary actual confusion when he first heard about the television program. As described by Jurczak, his confusion was dispelled almost immediately by another person present at the conversation who was familiar with the television program. Jurczak testified he had seen the newspaper in boxes on

the corners of Chicago but did not read it (Jurczak Tr. at 297) and also admitted he did not have cable television, and therefore could not watch the television program. Although the Seventh Circuit has found that "initial confusion may, in certain cases, be sufficient for a finding of likelihood of confusion even if the confusion is later dispelled," *Syndicated Sales Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 638 (7th Cir. 1999), it has also discounted testimony of alleged confusion from people who were not actual consumers of the products at issue. *See CAE*, 267 F.3d at 686 (person confused was not a customer of the plaintiff but a supplier); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 645 (7th Cir. 2001) (there was no evidence that the individuals who were alleged to have been actually confused purchased or attempted to purchase good from either party "and thus they were not relevant 'consumers' under the Lanham Act.") (citations omitted). Accordingly, I cannot place much weight on Jurczak's testimony because he did not identify himself as a consumer of either product. I find this factor favors defendant.

## G.  Intent

"This factor looks primarily for evidence that the defendants are attempting to 'pass off' their products as having come from the plaintiff." *Packman*, 267 F.3d at 644 (citing *Liquid Controls*, 802 F.2d at 940). There is no evidence that Fox News attempted to 'pass off' its television program as having come from plaintiff.

Accordingly, this fact weighs in favor of defendant.

## H. Other Evidence

Tribune relies heavily on the testimony of its expert, Professor Tim Calkins, a professor at Northwestern University Kellogg School of Management. Professor Calkins is a clinical professor of marketing, and is an expert on branding. He has never conducted a survey nor testified as an expert in any trademark case before this one. I have credited his testimony on the importance of the word redeye in creating brand recognition. He also testified that he found a likelihood that consumers would be confused by Fox News' use of Red Eye not just because redeye was the primary brand name in both uses but because both trademarks are aimed at younger adults and are "very similar" in content. I have concluded that the newspaper and television program are not similar in content, as discussed above. As I have also discussed, there is no evidence on this record that the same younger adults are reading REDEYE and watching the 1:00 a.m. Red Eye television show. Since I am unable to conclude that the factual premises on which he bases his conclusion are correct, I have not credited his conclusion on likelihood of confusion.

## IV.

Of the seven factors to be considered in deciding whether a trademark holder has shown a likelihood of confusion, plaintiff has established only that in name the salient portion of the marks are

the same and that Tribune's mark is strong in the local area of Chicago. The different source of each mark is shown on the relevant products. The products (at least as shown by the exhibits in evidence, copies of REDEYE distributed in the past week or so and clips from the television show on the Fox News Red Eye website) are similar only in that both are media centered, with overlap on the internet. The actual content is dissimilar. It is not disputed that there is no evidence in this record of the degree of care likely to be used by consumers. I also have found that there is no evidence of actual confusion. The parties agree that Fox had no intention of palming off its product as that of plaintiff.

The Seventh Circuit has held that the most important factors in deciding likelihood of confusion are similarity of marks, actual confusion and defendant's intent. *Barbecue Marx*, 235 F.3d at 1044. Similarity in marks is the only one of these factors that favors plaintiff. I conclude that on this record, plaintiff has shown only that there is a possibility that it may prevail in this action.

Tribune argues that it need only show that it has a better than negligible chance of winning at trial to be entitled to a preliminary injunction, citing Seventh Circuit law. The Seventh Circuit has also held, however, that "a preliminary injunction is a very serious remedy, 'never to be indulged in except in a case clearly demanding it'." *Barbecue Marx,* 235 F.3d at 1044. In

response to my inquiry about a survey that might be helpful in assessing likelihood of confusion, Tribune points to the statement in *Barbecue Marx* (and other cases) that expert evidence apart from a survey in some cases is sufficient. *Id.* at 1046. Undoubtedly it is. In this case, however, the only expert evidence contradicted what I find to be the facts on this record with respect to similarity in content, and the expert had no more basis for concluding that the same consumers are coming in contact with the two trademarks than I have.[5]

The Seventh Circuit instructs courts to employ a sliding scale in weighing the likelihood of success against the harm to each party and the public in determining the appropriateness of a preliminary injunction. See, e.*g., Promatek*, 300 F.3d at 811. Fox News presented evidence that it would not be able to change the name solely in the Chicago area, and would therefore be required to change the name of its program nationally. While I do not think the dollar cost to change the name would likely be as great as Fox News argued (indeed, the credible evidence suggests it would not be high), I am persuaded that it would be difficult to change the name of a show that apparently has attracted viewers nationally and then

---

[5] Tribune represented that it did conduct a survey but decided not to put it in evidence because given the short time it had to do the survey, it was not convinced that the methodology would be acceptable. It was, however, Tribune's choice to proceed immediately to a hearing on its motion for a preliminary injunction.

change it again if Tribune did not ultimately prevail.  On this record, therefore, I find that the balance of harms favors defendant.

It may be that additional evidence will show that the consuming public indeed is likely to confuse REDEYE with defendant's late night show. In view of the nature of the claim, I will order expedited discovery and set trial for August 6, 2007.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated: April 4, 2007